THE CITY OF BATAVIA, Plaintiff-Appellee, v. ROBERT O. SANDBERG *et al.*, Defendants-Appellants.

Second District   No. 2—96—0298

Opinion filed March 19, 1997.—Rehearing denied April 21, 1997.

John E. Waghorne, of Bloomingdale, for appellant.

William R. McGrath, of Batavia, for appellee.

PRESIDING JUSTICE GEIGER delivered the opinion of the court:

Defendant Robert O. Sandberg appeals from the orders of the circuit court of Kane County denying his traverse and motion to dismiss and granting judgment on the condemnation complaint filed by the plaintiff, the City of Batavia (the City). On appeal, Sandberg argues that the trial court erred in denying his traverse and motion to dismiss for the following reasons: (1) the City did not strictly fol-

low the Tax Increment Allocation Redevelopment Act (the Act) (65 ILCS 5/11—74.4—1 *et seq.* (West 1992)) and its own ordinances in condemning the subject property; (2) the City did not follow the legislative scheme in condemning the subject property; and (3) the City changed the nature of the redevelopment project without going through the approval process required by section 11—74.4—5(c) of the Act (65 ILCS 5/11—74.4—5(c) (West 1994)). We affirm.

On November 12, 1993, the City filed a complaint for condemnation, seeking to condemn a commercial building located at 2 East Wilson Street, Batavia, Kane County, Illinois (the subject property), which was owned by Sandberg. The City sought to condemn the subject property pursuant to section 11—74.4—4 of the Act (65 ILCS 5/11—74.4—4 (West 1992)). On January 18, 1994, Sandberg filed a traverse and motion to dismiss.

On February 14, 1994, the City filed a first amended complaint for condemnation and a response to Sandberg's traverse and motion to dismiss. On May 10, 1994, Sandberg filed a first amended traverse and motion to dismiss.

On May 16, 1994, the trial court held a hearing on Sandberg's first amended traverse and motion to dismiss. On August 1, 1994, the trial court denied the motion in part, finding: (1) that the City's acquisition of the subject property by the exercise of eminent domain was reasonably necessary to achieve the objectives of the redevelopment plan and project adopted by the City through ordinance No. 89—80 in conformance with the Act; (2) that the document entitled "Tax Increment Financing Redevelopment Plan and Project" (the Teska Report), which is incorporated into ordinance 89—80, complies with the requirements of a redevelopment plan and a redevelopment project under the Act; and (3) that ordinance No. 89—80 and resolution No. 93—20—R are valid exercises of power by the City and sufficient under the Act to establish the propriety of the condemnation of the subject property.

On December 6, 1994, Sandberg filed a motion to reconsider the trial court's denial in part of his first amended traverse and motion to dismiss. On January 20, 1995, following a hearing, the trial court denied Sandberg's motion to reconsider.

Also on January 20, 1995, the trial court denied the balance of Sandberg's traverse and motion to dismiss. That portion of the motion had argued that the City had abused its power by creating conditions that justified the taking of the subject property under the ordinances. Sandberg had also argued that the City had acted in a manner that would allow it to pay less for the subject property.

On September 15, 1995, the parties stipulated to the following:

"That the fair cash market value of the [subject property] was $75,000.00 on November 12, 1993, the date of filing of the Complaint for Condemnation."

Also on September 15, 1995, the parties filed a settlement agreement, and the trial court entered an agreed judgment order which provides, in pertinent part:

"This matter coming upon agreement of the parties, all matters having been agreed and settled between the parties, based upon the previously entered stipulation of the parties that the fair cash market [value] of the Subject Property is $75,000.00 on the date of the filing of the Petition for Condemnation.

THIS COURT FINDS that the value of the Subject Property on November 12, 1993, being the date of filing of the Complaint for Condemnation, was the sum of $75,000.00, and that the sum of $75,000.00 is the amount which reflects the just compensation due any and all Defendants as just compensation for the Subject Property taken.

IT IS ORDERED THAT upon Petition for vesting of title by the [City] and the deposit of the sum of $75,000.00, [the] City shall be entitled to transfer of title of the Subject Property."

On October 16, 1995, Sandberg filed a motion to vacate the judgment order, as well as the orders denying his motion to reconsider and his first amended traverse and motion to dismiss. Sandberg's motion also sought a rehearing on his first amended traverse and motion to dismiss. On February 13, 1996, the trial court denied Sandberg's motion.

On March 12, 1996, Sandberg filed a notice of appeal from the trial court's orders of August 1, 1994, January 20, 1995, September 15, 1995, and February 13, 1996. On appeal, Sandberg argues that the trial court erred in denying his first amended traverse and motion to dismiss.

■ A traverse and motion to dismiss challenge the plaintiff's right to condemn the defendant's property and will result in dismissal when the plaintiff cannot show its right to condemn by proper proof. *Forest Preserve District v. Estes*, 222 Ill. App. 3d 167, 175 (1991). Where a defendant in a condemnation suit contests the plaintiff's right to condemn by filing a traverse and motion to dismiss, the burden is upon the plaintiff to make a *prima facie* case of the disputed allegations. *Department of Transportation v. First Galesburg National Bank & Trust Co.*, 141 Ill. 2d 462, 469 (1990).

■ A municipality can only exercise the power of eminent domain when it has been specifically conferred by legislative enactment. *City of Oakbrook Terrace v. La Salle National Bank*, 186 Ill. App. 3d 343, 348 (1989). An ordinance granting the eminent domain power must

be strictly construed (*Department of Transportation*, 141 Ill. 2d at 468-69) in order to protect the rights of property owners (*Forest Preserve District*, 222 Ill. App. 3d at 175). A statutory grant of the eminent domain power can only be exercised in the manner authorized by statute. *Village of Skokie v. Gianoulis*, 260 Ill. App. 3d 287, 295 (1994).

■ In interpreting a statute, the primary rule of statutory construction, to which all other rules are subordinate, is to ascertain and give effect to the true intent and meaning of the legislature. *In re Application for Judgment & Sale of Delinquent Properties for the Tax Year 1989*, 167 Ill. 2d 161, 168 (1995). In order to determine the legislative intent, courts must read the statute as a whole, and all relevant parts must be considered. *People v. Lewis*, 158 Ill. 2d 386, 389 (1994). Each section should be construed in connection with every other section. *Bonaguro v. County Officers Electoral Board*, 158 Ill. 2d 391, 397 (1994). Courts should look to the language of the statute as the best indication of legislative intent, giving the terms of the statute their ordinary meaning. *In re Application for Judgment*, 167 Ill. 2d at 168. Where the statutory language is clear, courts should give effect to the statute as enacted without considering extrinsic aids for construction. *Bogseth v. Emanuel*, 166 Ill. 2d 507, 513 (1995).

In the present case, once Sandberg contested the City's right to condemn by filing a traverse and motion to dismiss, the City had the burden of establishing that it had the authority under the Act to exercise its right of eminent domain to acquire the subject property. In order to meet this burden, the City introduced the following evidence: (1) a certified copy of ordinance No. 89—80, the "Ordinance Approving the Riverfront Tax Increment Redevelopment Plan and Riverfront Redevelopment Projects"; (2) a certified copy of ordinance No. 89—81, the "Ordinance Designating the Riverfront Tax Increment Project Area"; (3) a certified copy of ordinance No. 89—82, the "Ordinance Adopting Tax Increment Financing for the Riverfront Redevelopment Project"; (4) a certified copy of resolution No. 93—20—4, the "Resolution Authorizing Initiation of Proceedings to Acquire Certain Real Property Within the Batavia Redevelopment Project Area"; (5) an enlargement of its conceptual land use plan; (6) photographs of the subject property; and (7) an enlargement of its potential public improvements scheme. In addition, Robert Teska, an expert in the area of tax increment financing districts and land planning, testified on the City's behalf. Following Teska's testimony, the City rested.

Gregg Gabel, an expert in the fields of land planning and tax increment financing, testified on behalf of Sandberg. Following Ga-

bel's testimony, Sandberg rested. The City then rested without any rebuttal testimony.

■ Sandberg's first argument on appeal is that the trial court erred in denying his traverse and motion to dismiss because the City did not strictly follow several sections of the Act and its own ordinances in condemning the subject property. Sandberg first argues that the City did not follow section 11—74.4—3(p) of the Act (65 ILCS 5/11—74.4—3(p) (West 1994)). A redevelopment project area is defined in section 11—74.4—3(p) of the Act as follows:

"(p) 'Redevelopment project area' means an area designated by the municipality *** in respect to which the municipality has made a finding that there exist conditions which cause the area to be classified as an industrial park conservation area or a blighted area or a conservation area, or a combination of both blighted areas and conservation areas." 65 ILCS 5/11—74.4—3(p) (West 1994).

A conservation area is defined in section 11—74.4—3(b) of the Act as follows:

"(b) 'Conservation area' means any improved area within the boundaries of a redevelopment project area located within the territorial limits of the municipality in which 50% or more of the structures in the area have an age of 35 years or more. Such an area is not yet a blighted area but *** is detrimental to the public safety, health, morals or welfare and such an area may become a blighted area." 65 ILCS 5/11—74.4—3(b) (West 1994).

In ordinance No. 89—80, the City made the following finding:

"(b) There exist conditions which cause the area to be designated as a Redevelopment Project Area and classified as a 'Conservation Area' as defined in Section 11—74.4—3(b) of the Act." Batavia, Ill., Ordinance No. 89—80(b) (eff. December 5, 1989).

Sandberg acknowledges that the City made the above finding, but argues that ordinance No. 89—80 and the Teska Report, which was prepared by Teska Associates, Inc., and incorporated into ordinance No. 89—80, fail to establish the remaining elements which define a conservation area, specifically, that it "is detrimental to the public safety, health, morals or welfare" and that it "may become a blighted area" (see 65 ILCS 5/11—74.4—3(b) (West 1994)).

The City argues that when it used the words "a 'Conservation Area' as defined in Section 11—74.4—3(b) of the Act" in ordinance No. 89—80, it adopted and included the entire definition being referred to, i.e., the definition of a conservation area. The City argues that there is no requirement within the Act that the entire definition of conservation area be included verbatim in the findings. We agree with the City in this regard. It makes no difference whether the City uses the phrase "a 'Conservation Area' as defined in Section 11—

74.4—3(b) of the Act" or includes verbatim the entire definition of a conservation area in its findings. The substance of the findings would be the same either way.

■ Sandberg next argues that ordinance 89—80 is invalid because it does not comply with section 11—74.4—3(n)(1) of the Act (65 ILCS 5/11—74.4—3(n)(1) (West 1992)). Section 11—74.4—3(n) of the Act provides, in pertinent part:

> "No redevelopment plan shall be adopted by a municipality without findings that (1) the redevelopment project area on the whole has not been subject to growth and development through investment by private enterprise and would not reasonably be anticipated to be developed without the adoption of the redevelopment plan ***." 65 ILCS 5/11—74.4—3(n)(1) (West 1992).

In ordinance No. 89—80, the City made the following finding:

> "The proposed Riverfront Redevelopment Project Area on the whole has not been subject to growth and development through investment by private enterprise and would not be reasonably anticipated to be developed without the adoption of the Riverfront Redevelopment Plan." Batavia, Ill., Ordinance No. 89—80 (eff. December 5, 1989).

Sandberg acknowledges that the City made the above finding, but notes that ordinance No. 89—80 incorporates the entire Teska Report, which provides, in pertinent part:

> "The Project Area on the whole has not been subject to appropriate growth and redevelopment through investment by private enterprise, and would not reasonably be anticipated to be developed consistent with City policies without adoption of this Redevelopment Plan."

Sandberg argues that the Teska Report's use of the word "appropriate" indicates that there is some growth. He argues that the Act does not say that an area with too little or the wrong type of growth qualifies for redevelopment pursuant to the Act.

The City argues that it made the precise finding that is required by the Act. We agree. The fact that the Teska Report uses the words "appropriate growth" does not invalidate the City's express findings in ordinance No. 89—80. The prefatory language in ordinance No. 89—80 demonstrates that the Teska Report was only one of several considerations relied upon by the City in making its findings.

■ Sandberg next argues that ordinance No. 89—80 is invalid because it does not comply with section 11—74.4—3(n)(2) of the Act (65 ILCS 5/11—74.4—3(n)(2) (West 1992)). Section 11—74.4—3(n)(2) of the Act provides, in pertinent part:

> "No redevelopment plan shall be adopted by a municipality without findings that *** (2) the redevelopment plan and project

conform to the comprehensive plan for the development of the municipality as a whole ***." 65 ILCS 5/11—74.4—3(n)(2) (West 1992).

In ordinance No. 89—80, the City made the following finding:

"d. The Riverfront Redevelopment Plan and Riverfront Redevelopment Projects conform to the Comprehensive Plan for the development of [the City] as a whole." Batavia, Ill., Ordinance No. 89—80(d) (eff. December 5, 1989).

Sandberg admits that the City made the above finding but notes that Ordinance No. 89—80 incorporates the entire Teska Report, which provides, in pertinent part:

"The Redevelopment Plan is consistent with the City's current Comprehensive Plan with some minor exceptions. Where minor differences occur between this Redevelopment Plan and the Comprehensive Plan, the City may amend the Comprehensive Plan to better reflect the goals and objectives in the Project Area." Batavia, Ill., Ordinance No. 89—80 (eff. December 5, 1989).

Sandberg argues that the Teska Report's use of the words "with some minor exceptions" demonstrates that the redevelopment plan is not in strict conformity with the comprehensive plan. He argues that the Act does not say that minor deviation is acceptable and that conformity must be strict.

The City argues that it made the precise finding required by the Act. We agree. The fact that the Teska Report indicates that there are some minor differences between the redevelopment plan and the current comprehensive plan does not undermine the express finding made by the City. Ordinance No. 89—80, on its face, indicates that the City considered other matters in making its findings. Specifically, following a public hearing, the City reviewed testimony concerning the need for conservation in the proposed project area; it reviewed other studies and was generally informed of the conditions in the proposed project area; it reviewed the conditions pertaining to lack of private investment in the proposed project area to determine whether private development would take place in the proposed project area as a whole without the adoption of the proposed riverfront redevelopment plan; it reviewed the conditions pertaining to real property in the proposed project area to determine whether contiguous parcels of real property and improvements thereon would be substantially benefited by the proposed project improvements; and it reviewed its proposed riverfront redevelopment plan and project as well as the comprehensive plan for the development of the municipality as a whole to determine whether the proposed plan and project conform to the comprehensive plan.

■ Sandberg next argues that ordinance No. 89—80 is invalid because the City did not comply with section 11—74.4—3(n)(3) of the Act (65 ILCS 5/11—74.4—3(n)(3) (West 1992)). Section 11—74.4—3(n)(3) provides, in pertinent part:

> "No redevelopment plan shall be adopted by a municipality without *** (3) stating the estimated dates, which shall not be more than 23 years from the adoption of the ordinance approving the redevelopment project area ***, of completion of the redevelopment project and retirement of obligations incurred to finance redevelopment project costs ***." 65 ILCS 5/11—74.4—3(n)(3) (West 1992).

In ordinance No. 89—80, the City made the following findings:

> "f. The estimated date for final completion of the Riverfront Redevelopment Projects is 23 years from the effective date of this Ordinance.
>
> g. The estimated date for retirement of obligations incurred to finance the Riverfront Redevelopment Projects costs shall be not later than 23 years from the effective date of this Ordinance."

Batavia, Ill., Ordinance Nos. 89—80(f), (g) (eff. December 5, 1989).

Sandberg argues that section 11—74.4—3(n)(3) requires calendar dates and that the 23 years referred to in that section is intended to be a limitation imposed upon those calendar dates, not a substitute therefore. The City argues, and we agree, that it complied with the requirements of section 11—74.4—3(n)(3) of the Act. Substantively, there is no difference between the date December 5, 2012, and "23 years from the effective date of this ordinance" when, by its own terms, ordinance No. 89—80 was effective as of December 5, 1989. The Act does not state that a calendar date must be specified, nor has Sandberg provided any authority for his argument that the Act requires a calendar date.

■ Sandberg's next argument on appeal is that the trial court erred in denying his traverse and motion to dismiss because the City did not follow the legislative scheme delineated in the Act in condemning the subject property. We find no merit to this argument.

Upon a municipality's determination that an area qualifies as a redevelopment project area as defined in section 11—74.4—3(p) of the Act, it may then develop a redevelopment plan. Section 11—74.4—3(n) of the Act provides, in pertinent part:

> "(n) 'Redevelopment plan' means the comprehensive program of the municipality for development or redevelopment intended by the payment of redevelopment project costs to reduce or eliminate those conditions the existence of which qualified the redevelopment project area as a 'blighted area' or 'conservation area' or combination thereof or 'industrial park conservation area,' and

thereby to enhance the tax bases of the taxing districts which extend into the redevelopment project area." 65 ILCS 5/11—74.4—3(n) (West 1992).

Section 11—74.4—3(n) of the Act requires that the redevelopment plan be in writing and meet certain other criteria not germane to this appeal.

Following creation of the redevelopment project area and approval of a redevelopment plan and project, the municipality is granted the power, among other things, to:

"c. Within a redevelopment project area, acquire by *** eminent domain; own, convey, *** or dispose of land and other property, real or personal, *** all in the manner and at such price the municipality determines is reasonably necessary to achieve the objectives of the redevelopment plan and project." 65 ILCS 5/11—74.4—4(c) (West 1994).

The City's goals and objectives were set forth in the Teska Report. Those goals and objectives were primarily related to improving the City's downtown, especially its riverfront, by encouraging development and redevelopment within the area and to visually enhance the area by improving the attractiveness of properties and structures within the area. The redevelopment plan divides the redevelopment project area into four planning districts. The subject property is contained within "Planning District Four: South Riverfront." This area was "targeted for public improvements, and limited private redevelopment."

Included among the specific objectives to guide redevelopment were the following:

"Preserve the existing architectural character of Wilson Street *** to retain the unique charm of the central business district.

Encourage property owners to upgrade existing properties along Wilson Street ***. Explore opportunities to stimulate private investment such as a facade rehabilitation loan program.

Undertake streetscape improvements along *** Wilson Street to the eastern border of the Project Area. These improvements should be consistent with the nature of existing or new development to enhance the area's appearance and create a unified identity in the downtown and riverfront areas."

The Teska Report further contained a description of the redevelopment projects and stated:

"In accordance with the goals and objectives set forth in the previous section, the City[ ] must implement a coordinated Redevelopment Project which may include, but is not limited to, the following redevelopment activities.
***

To meet the redevelopment objectives, it may be necessary for the City[ ] to assemble property. ***
***

Property acquired by the City may be assembled into appropriate redevelopment sites. These properties may be sold or leased by the City to other public bodies or to private developers, in whole or in part."

In resolution No. 93—20—R, the City found "that the acquisition of the subject property is reasonably necessary to achieve the objectives of the redevelopment plan." The City's expert testified to those attributes of the subject property that precisely matched the goals and objectives of the redevelopment plan. After identifying the subject property and its condition, he testified that its location within the redevelopment area was of importance for the following reasons: (1) The property was central to the redevelopment area; (2) the property was on the banks of the Fox River, and one of the major goals of the redevelopment project is the enhancement of the riverfront and abutting properties; and (3) the property was also on Wilson Street, the primary business street, which exhibits much of the historical character of the downtown. Teska further opined that there was nothing within the redevelopment project section of the Teska Report that would prohibit the City from acquiring the subject property for redevelopment.

Sandberg's own expert testified that the redevelopment project section of the Teska Report did not prohibit the City from acquiring pieces of property other than those already identified in the redevelopment plan. He further acknowledged that acquisition of the subject property could be in furtherance of the objectives specifically contained in the Teska Report, including capitalization upon the unique character of the redevelopment project area and the encouragement of private investment.

After a careful review of the record, we conclude that, in light of the clearly delineated goals and objectives stated in the redevelopment plan and project, the City had the authority under the Act to acquire the subject property by eminent domain. We find no merit to Sandberg's argument that the City failed to follow the legislative scheme contained within the Act.

■ Sandberg's final argument on appeal is that the trial court erred in denying his traverse and motion to dismiss because the City changed the nature of the redevelopment project without going through the approval process required by section 11—74.4—5(c) of the Act (65 ILCS 5/11—74.4—5(c) (West 1994)). Section 11—74.4—5(c) of the Act provides:

"(c) After the adoption of an ordinance approving a redevelopment plan or project or designating a redevelopment project area, no ordinance shall be adopted altering the exterior boundaries, affecting the general land uses established pursuant to the plan or changing the nature of the redevelopment project without complying with the procedures provided in this division pertaining to the initial approval of a redevelopment plan project and designation of a redevelopment project area." 65 ILCS 5/11—74.4—5(c) (West 1994).

Sandberg argues that the nature of the redevelopment project is conservative and that the acquisition of private property for redevelopment is not conservative and, therefore, not within the City's power under the redevelopment project. We find no merit to this argument. Sandberg bases his argument that the redevelopment project is conservative on a portion of the Teska Report that generally provides that public funds are to be spent in a careful manner. The Teska Report's description of the redevelopment project as conservative was clearly not intended as a limit upon property identification or procurement.

The City argues, and we agree, that the nature of the redevelopment plan and project must be assessed in the context of the specific goals and objectives expressed in the redevelopment plan and project document, which in this case is the Teska Report. As the City argues, the "nature" issue is actually a question of necessity. What Sandberg is actually arguing is that the City's acquisition of the subject property was not reasonably necessary to achieve the goals and objectives of the redevelopment plan and project. As we quoted above, section 11—74.4—4(c) of the Act grants a municipality the following powers:

"(c) Within a redevelopment project area, acquire by *** eminent domain; own, convey, *** or dispose of land and other property, real or personal, *** all in the manner and at such price the municipality determines is reasonably necessary to achieve the objectives of the redevelopment plan and project." 65 ILCS 5/11—74.4—4(c) (West 1994).

The determination of necessity is a legislative function that should be given great deference by the trial and reviewing courts. *Department of Public Works & Buildings v. Keller*, 61 Ill. 2d 320, 325 (1975). Specifically, in regard to actions to acquire property under the Act, it is not for a court to interfere with the legislative determination unless there is a showing of a clear abuse of discretion by the municipality. See *Village of Wheeling v. Exchange National Bank*, 213 Ill. App. 3d 325, 334 (1991). The general rule, as stated in *City of Chicago v. Vaccarro*, 408 Ill. 587, 597 (1951), is "that where the legislature has delegated to a corporation the authority to exercise

the power of eminent domain, the corporation has also the authority to decide on the necessity for exercising the right, and its decision will be conclusive in the absence of a clear abuse of the power granted."

In its order denying Sandberg's first amended traverse and motion to dismiss, the trial court in the present case found:

"1. That acquisition by the exercise of eminent domain, by [the] City[ ] of the [subject property] is reasonably necessary to achieve the objectives of the redevelopment plan and project adopted by [the City] through[ ] Ordinance No. 89—80 in conformance with 65 ILCS 5/11—74.4.

2. That the [Teska Report, which was] made a part of [ ] Ordinance 89—80, complies with the requirements under the aforesaid Act of a 'Redevelopment Plan' and 'Redevelopment Project.'

2. [*sic*] That[ ] Ordinance No. 89—80[ ] and[ ] Resolution 93—20—R are valid exercises of power by the City[ ], and sufficient under the [ ] Act to establish the propriety and the condemnation of the subject property."

The trial court therefore determined that the City's acquisition of the subject property was necessary and in conformance with the Act, and Sandberg has shown no clear and convincing evidence otherwise. We note that the City's expert testified that acquisition and redevelopment of the subject property would not represent a change in land use. In fact, Sandberg's own expert acknowledged that acquisition of the subject property was consistent with the goals of the City's redevelopment plan and project. One of the objectives of the redevelopment plan is to "[p]romote riverfront and downtown economic development which capitalizes on the unique character of the Project Area." Sandberg's expert acknowledged that if one of the objectives of the redevelopment plan was to capitalize on the unique character of the redevelopment project area, acquisition of the subject property could be in furtherance of that goal.

Another goal of the redevelopment plan is "to promote the health, safety, morals, and welfare of the general public" by "removing and alleviating adverse conditions by encouraging private investment of underutilized and vacant properties which will strengthen the economy, tax base, business environment, and living environment." Sandberg's expert acknowledged that the acquisition of the subject property could be in furtherance of that goal. He further acknowledged that the acquisition and redevelopment of the subject property would not represent a change in land use.

Based upon the evidence outlined above, we cannot conclude that

the City abused its discretion in determining that the acquisition of the subject property was reasonably necessary to achieve the objectives of the redevelopment plan and project. See *Vaccarro*, 408 Ill. at 597. Nor can we conclude that the City changed the nature of the redevelopment project when it decided to condemn the subject property. See 65 ILCS 5/11—74.4—5(c) (West 1994).

For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed.

Affirmed.

INGLIS and RATHJE, JJ., concur.